[Cite as *In re L.T.*, 2022-Ohio-114.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: L.T.

C.A. No.     29972

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 19 04 0324

DECISION AND JOURNAL ENTRY

Dated: January 19, 2022

CARR, Presiding Judge.

{¶1} Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her child in the permanent custody of Summit County Children Services Board ("CSB" or the "agency"). This Court affirms.

I.

{¶2} Mother and Father are the biological parents of L.T. (d.o.b. 5/31/2017). CSB removed the child shortly after his birth and filed a complaint alleging the child's dependency. L.T. was adjudicated a dependent child. He was later returned to Mother's legal custody after she complied with her case plan objectives.

{¶3} In January 2019, CSB filed a new complaint alleging that L.T. was a dependent child based on Mother's mental health issues and difficulties providing for the child's basic needs. L.T. remained in Mother's legal custody under the protective supervision of the agency,

although he was placed with Father. After Father determined that he was unable to provide daily care for the child, however, the parents agreed to L.T.'s removal by the agency. CSB dismissed its case based on statutory time limitations but immediately refiled its complaint. Mother and Father waived their rights to a shelter care hearing and stipulated to a finding of probable cause for the child's removal from his home.

{¶4} After an adjudicatory hearing, the juvenile court found L.T. to be a dependent child. Both parents waived their rights to a dispositional hearing and agreed to the child's placement in the temporary custody of CSB. The juvenile court found that the agency had used reasonable efforts to prevent the child's continued removal from home and adopted the agency's case plan as an order. Pursuant to the case plan, Mother was required to obtain a mental health assessment, follow all recommendations, and take her medications as prescribed. Both parents were required to maintain safe and stable housing with functioning utilities, grant the agency caseworker access to their homes, and provide documentation of legal sources of income. Later, CSB amended the case plan on the magistrate's order to include another objective for Mother to obtain an evaluation at Community Support Services and receive financial management assistance.

{¶5} Throughout the case, Father was allowed to have unsupervised overnight visitation with the child. Father initially agreed to supervise Mother's visits, but he later withdrew his agreement based on the parents' increasingly hostile relationship. Mother's visits were transferred to the agency's Family Interaction Center.

{¶6} The evidence presented at the first two review hearings demonstrated that Mother was not complying with her case plan objectives in any significant way. Father continued to visit with the child but remained uncommitted to seeking custody. Ten months into the case,

CSB filed a motion for permanent custody. Mother moved for a six-month extension of temporary custody.

{¶7} Immediately prior to the scheduled permanent custody hearing, Father filed motions for a six-month extension of temporary custody, legal custody to Mother, or, alternatively, legal custody to himself. Based on Father's formal expression of interest in assuming custody, the juvenile court continued the permanent custody hearing for three months to give Father time to work on his case plan objectives. In the meantime, the foster parents requested that CSB remove the child from their home. Although the agency had hoped to place the child in Father's home, that placement was unsuccessful due to Father's lack of a childcare plan for L.T. Instead, the agency placed L.T. with his maternal grandparents, who had been approved after a kinship assessment. The child remained in his grandparents' home for the duration of the case.

{¶8} CSB moved to continue the permanent custody hearing due to lack of the agency's receipt of newly discovered medical records. The juvenile court continued the hearing for an additional three months. Mother moved for a second six-month extension of temporary custody. Two months prior to the permanent custody hearing, Father voluntarily surrendered his parental rights due to serious health issues that had arisen.

{¶9} After the permanent custody hearing, the juvenile court denied Mother's motion for a six-month extension of temporary custody, granted CSB's motion for permanent custody, and terminated Mother's parental rights. Mother filed a timely appeal and raises one assignment of error for review.

II.

## ASSIGNMENT OF ERROR

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN DENYING MOTHER'S MOTION FOR SIX-MONTH EXTENSION AND IN GRANTING [CSB'S] MOTION FOR PERMANENT CUSTODY AS THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶10} Mother argues that the juvenile court's judgment terminating her parental rights and placing L.T. in the permanent custody of CSB was against the manifest weight of the evidence. This Court disagrees.

{¶11} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶12} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of

the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶13} As to the first prong, CSB alleged that L.T. could not or should not be returned to either parent pursuant to R.C. 2151.414(B)(1)(a). The juvenile court found that the agency met its burden of proof based on two of the three subsection (E) grounds alleged. Those subsections provide as follows:

> In determining at a hearing [on a motion for permanent custody] whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a [permanent custody] hearing * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code[.]

Although the agency might allege alternative first-prong grounds in support of its motion for permanent custody, it need only prove one. *In re T.B.*, 9th Dist. Summit Nos. 29560 and 29564, 2020-Ohio-4040, ¶ 11.

{¶14} This Court concludes that CSB proved by clear and convincing evidence that Mother failed continuously and repeatedly to substantially remedy the conditions that led to L.T.'s removal. *See* R.C. 2151.414(E)(1). The agency removed the child from Mother's home based on Mother's untreated mental health issues and circumstances indicating her inability to provide for the child's basic needs. Mother's mental health issues presented as delusions and paranoia. Mother frequently called the police to report that people were breaking in and spreading cocaine throughout her home, although those claims were repeatedly investigated and unsubstantiated. Her paranoia prevented her from trusting people and the systems in place to assist her. Mother's struggle to meet the basic needs of the child and herself were evidenced by a lack of food, furniture, and clothing for the child in the home. Mother's lease was ending, and she had not made any further arrangements for housing. Nevertheless, Mother refused the agency's referrals for housing and access to a food pantry.

{¶15} Based on these concerns, CSB created case plan objectives for Mother to allow her to address her mental health issues and create and maintain a safe and secure home for L.T. When it became apparent that Mother's difficulty budgeting and managing her financial resources exacerbated her struggle to provide for her family's basic needs, the agency added a

referral for financial management assistance for Mother. Despite the agency's efforts and case management, Mother failed to make significant progress on her case plan objectives.

{¶16} Early in the case, Mother participated in a mental health intake assessment at Fairhaven Behavioral Health after which she was diagnosed with adjustment disorder and paranoid personality disorder. Her counselor at Fairhaven testified that personality disorders require long-term counseling to manage symptoms. Although a patient may learn to control the manifestations of a personality disorder by developing coping skills, the disorder will persist. Specific to Mother, the counselor testified that Mother's paranoia presented as distrust of people in general, as well as the legal system and CSB. For example, Mother indicated that she believed that CSB was setting her up to lose her child. In addition, Mother reported to the counselor that the agency and her neighbors were surreptitiously watching and listening to Mother, and that unknown people were breaking into her home. Mother ceased attending counseling sessions at Fairhaven within a few weeks.

{¶17} Mother failed to engage in any mental health services for the next five and a half months. Thereafter, she participated in an intake assessment at Portage Path Behavioral Health and was diagnosed with delusional disorder and bipolar disorder with psychotic features. Mother's counselor testified that delusional disorder causes a patient to believe things that are not true. In Mother's case, she believed that neighbors were breaking into her apartment and dispersing harmful substances to make her ill, that people were listening in on her conversations, and that she was frequently suffering from serious health-related issues such as heart attack or stroke.

{¶18} The Portage Path counselor testified that Mother historically coped with her fears of break-ins and serious health issues by calling the police and going to hospital emergency

rooms. The counselor worked with Mother to instead focus on evidence that no one had been in her home or that she was not experiencing a health emergency and to consider whether her immediate fears were irrational. Although the counselor testified that Mother had made some progress with treatment, she asserted that Mother's fears "continue[ ] to be a pretty big problem for her" in that they interfere with her ability to function, causing isolation and significant stress for Mother.

{¶19} Mother's counselor from Portage Path testified that Mother reported that she last called the police to report a break-in a few months before the permanent custody hearing. The counselor believed that Mother had developed some insight into recognizing inappropriate responses to stressors. For example, in addition to limiting her calls to police, Mother was working on accepting the circumstances she could not control such as when the child's grandmother would not respond to her calls. However, the counselor was not aware of multiple instances testified to by the child's grandfather where Mother would begin calling and texting them incessantly from 5:00 a.m. throughout the evening to reach the grandparents.

{¶20} CSB's supervisor of the visitation center testified as follows regarding three incidents during which Mother exhibited inappropriate behaviors. A year and a half into the case, Mother wanted to move from her assigned visitation room to the center's lobby in defiance of the agency's pandemic protocols. When the supervisor refused, Mother ended her visit early, leaving the supervisor and an aide to wait with L.T. until his caregiver arrived to pick up the child. Two months later, Mother insisted that the child was being hit and mistreated by his caregivers. Mother repeatedly asked L.T. if someone in his home was hitting him, even though the child had no bruises or other marks on his body and consistently denied any abuse. Finally, a month and a half before the permanent custody hearing, Mother began yelling and cussing at the

child during a visit. She would not comply with efforts by the visitation aide to redirect her. Mother further refused to comply with the center's mask requirement during a pandemic. After Mother continued to cuss and yell at center workers about being tired of complying with rules, the supervisor terminated the visit on Mother's request and escorted Mother from the visitation room. In each of these cases, Mother failed to utilize coping strategies to address stressors she perceived.

{¶21} The agency caseworker testified that he saw no consistent progress regarding Mother's ability to meet the child's needs. Despite financial counseling services, Mother never had any food and had only very sparse furnishings in her home whenever the caseworker visited. The toddler bed that was in Mother's home for a very brief period disappeared. Although Mother had a dining table at one time, Mother reported that she broke it. She never replaced it.

{¶22} Even though Mother had been participating in mental health services during the ten months prior to the permanent custody hearing, the caseworker testified he was concerned that Mother remained unable to meet the emotional needs of the child as evidenced by Mother's angry outbursts, yelling, and cussing at and in the presence of the child. Mother remained stubborn and resistant to following rules. For example, although L.T. came into care with a mouthful of rotten teeth requiring oral surgery, Mother continued to bring sugary drinks for the child against the advice of the caseworker. She also continued to bring dairy foods for the child, although she knew he was lactose intolerant and experienced diarrhea and rashes after eating such foods. When reminded by the caseworker of the child's dietary issues, Mother got mad, threw the food away, and failed to calm the child who began to have a meltdown. L.T. exhibited insecurity with Mother, often engaging in aggressive and violent behavior with Mother but not with others.

{¶23} Although the caseworker testified that he saw some progress because of Mother's reengagement in mental health services, he did not see evidence that she was "benefitting in a way that lowers risk to the child[.]" Mother's ongoing issues during visits and in communications with service providers and the child's caretakers raised a concern for both the caseworker and guardian ad litem that Mother had not become stable enough to parent L.T. in an emotionally healthy manner.

{¶24} Based on this Court's review, CSB established by clear and convincing evidence that Mother had failed to remedy the concerns that led to the child's removal from his home. Mother continued to struggle to be able to provide for the child's basic needs. Her home was devoid of food and furnishings necessary for the child's well-being. Mother's inability to budget to meet her financial obligations and buy necessary items for the home remained unresolved. In addition, she was inconsistent in engaging in mental health services. Despite Mother's recent return to counseling and medication management, she failed to demonstrate the consistent ability to apply coping strategies to address her ongoing irrational worries. Accordingly, the juvenile court's first-prong finding that L.T. could not or should not be returned to Mother's care was not against the manifest weight of the evidence.

{¶25} The agency further proved that an award of permanent custody was in the child's best interest. L.T. has spent the majority of his short life outside of Mother's custody. He was removed as a newborn but later returned home. CSB removed the child again when he was not yet two years old. He spent some time in Father's physical custody, but L.T. spent most of the 22 months of the case in agency custody during which he was placed in foster homes or with relatives.

{¶26} Although there is a bond between Mother and the child, the caseworker observed that L.T. becomes frustrated by the limits Mother places on him as he tries to play and explore. Mother has grilled the child about abuse she suspects he is enduring in his grandparents' home despite the child's denials and the lack of any physical evidence indicating abuse. Mother has become very emotional and angry for various reasons while visiting with L.T., resulting in the child's aggression and acting out with Mother but not with others.

{¶27} At the time of the permanent custody hearing, L.T. had been living with his grandparents for approximately six months. The child is very comfortable in that home and the grandparents are nurturing. L.T. shares a bond, not only with his grandparents, but also with their 12-year-old child in the home and a 14-month-old child the grandparents babysit.

{¶28} L.T. is too young to express his desire regarding custody. The guardian ad litem reported that an award of legal custody to Mother would not be in the child's best interest due to Mother's inconsistency in visiting the child, her job instability, and her ongoing paranoid behaviors and failure to develop appropriate coping skills to address her mental health issues on a regular basis. On the other hand, the guardian ad litem supported an award of permanent custody as the only viable option for the child's custody, given Father's relinquishment of parental rights and Mother's demonstrated instability.

{¶29} L.T. was not yet four years old at the time of the permanent custody hearing. Throughout his lifetime, he lived at times with Mother, Father, in four foster and/or respite homes, and with his grandparents. The child requires the custodial permanency that has not yet existed for him. His grandparents are willing to adopt the child and provide him with a permanent and stable home.

{¶30} Mother has not established financial stability. She changed jobs three times in the last year of the case. Although Mother claimed to have secured new employment by the time of the hearing, she was unable to provide any documentation to the caseworker to support her claim. Throughout the case, Mother struggled to meet her financial obligations despite the availability of financial management services. There was no food and almost no furnishings in her home. She was frequently behind in her rent payments. Mother was not receiving her mail because she could not afford to pay $25 for a lost mailbox key. As she was struggling to meet her own basic needs, Mother would have had problems providing necessities for the child as well.

{¶31} In addition, notwithstanding her reengagement in mental health services, Mother had not developed the coping skills or insight into her issues to be able to provide an emotionally stable environment for the child. Mother's irrational beliefs of break-ins and health problems continued to compel her to seek the services of the police and emergency health providers. While her counselor believed that Mother had made some progress, the counselor was unaware that Mother continued to react to stressors in ways indicating a failure to consistently apply coping skills. For example, Mother continued to have difficulty coping with the child's high energy, aggression, and outbursts during visits. She had also been unable to suppress her urges to repeatedly contact the child's caregivers and the guardian ad litem. The guardian ad litem described Mother's constant texting to her and the grandparents as tantamount to harassment. It was unclear whether Mother had resumed taking her prescribed medications as directed. In any event, her behaviors and reactions to stressors prevented Mother from providing an emotionally stable environment for L.T.

**{¶32}** Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by terminating the parents' parental rights and awarding permanent custody of L.T. to CSB. Father voluntarily relinquished his parental rights. Mother failed to address her budgeting issues and demonstrate that she could provide basic necessities for the child. In addition, Mother had not developed the insight or skills to allow her to manage her mental health issues, including the delusions that compelled her irrational behavior. Under these circumstances, CSB established by clear and convincing evidence that an award of permanent custody was in the best interest of the child. Accordingly, the juvenile court's judgment terminating Mother's and Father's parental rights and placing L.T. in the permanent custody of the agency was not against the manifest weight of the evidence.

**{¶33}** This Court rejects Mother's argument that the juvenile court erred by failing to grant an extension of temporary custody based on her case plan progress. R.C. 2151.415(D) permits extensions of temporary custody beyond one year only if the extension is in the best interest of the child, a parent has made substantial progress towards reunification, and reunification is likely to occur within the period of extension. It is well settled that, where an award of permanent custody is in the child's best interest, a six-month extension of temporary custody necessarily is not. *See In re A.S.*, 9th Dist. Summit No. 28743, 2017-Ohio-8984, ¶ 31. Moreover, Mother failed in this case to make substantial progress on her case plan, and there was no reasonable cause to believe that L.T. might have been reunified with Mother during the time remaining in what would have been a second six-month extension of temporary custody.

**{¶34}** Finally, to the extent that Mother argues that the permanent custody judgment cannot stand because CSB failed to use reasonable reunification efforts, we disagree. R.C.

2151.419, which addresses when a juvenile court must determine whether the agency has used reasonable efforts to assist reunification, does not require such a determination at the time of the permanent custody hearing unless the agency has not demonstrated the use of reasonable efforts prior to that time. *In re L.R.*, 9th Dist. Summit Nos. 29266 and 29271, 2019-Ohio-2305, ¶ 14. Because Mother failed to challenge the juvenile court's prior reasonable efforts findings in this case, she has forfeited the issue except for a claim of plain error. *Id.* at ¶ 18. She has not developed a plain error argument in this case, and this Court will not do so on her behalf. *See id.* Mother's assignment of error is overruled.

### III.

{¶35} Mother's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

CALLAHAN, J.
SUTTON, J.
CONCUR.

APPEARANCES:

RONALD T. GATTS, Attorney at Law, for Appellant.

MARK SWEENEY, Attorney at Law, for Appellee.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

JOSEPH KERNAN, Guardian ad Litem.