[Cite as *In re J.T.*, 2022-Ohio-455.]

STATE OF OHIO      )             IN THE COURT OF APPEALS
                       )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

IN RE: J.T.                              C.A. Nos.     30012
     C.G.                                  30013
     L.G.                                  30014

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.   DN19-09-0734
              DN19-09-0735
              DN19-09-0759

DECISION AND JOURNAL ENTRY

Dated: February 16, 2022

CARR, Presiding Judge.

{¶1}    Appellant, T.G. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed three of her minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2}    Mother is the biological mother of J.T., born October 10, 2014; C.G., born August 14, 2018; and L.G., born February 24, 2012. Mother has one other child, who was also a party to the trial court proceedings, but that child was ultimately placed in the legal custody of his father and is not a party to this appeal. The father of L.G. passed away during the trial court proceedings

from a sudden illness. The father of J.T. and the alleged father of C.G. did not participate in the trial court proceedings or appeal the trial court's judgment.

{¶3} CSB first became involved with Mother's family during June 2019. The agency filed complaints and the children were removed from the home because of concerns about Mother's lack of stable housing and her ongoing problem with substance abuse. The initial cases were later dismissed, the children remained placed outside Mother's custody, and CSB filed new complaints in September 2019. The children were later adjudicated dependent and placed in the temporary custody of CSB.

{¶4} The case plan required that Mother acquire and maintain stable income and housing and obtain mental health and substance abuse assessments and follow all treatment recommendations. Mother attended one session to begin a mental health assessment but did not return to the agency to finish it. She did complete a substance abuse assessment, which resulted in a diagnosis of amphetamine use disorder and a recommendation that Mother participate in weekly counseling and random drug testing.

{¶5} For the next several months, Mother engaged in combined substance abuse and mental health counseling, regularly tested negative for drugs, and obtained stable housing. Mother's supervised visits with her children were gradually moved away from the visitation center to less restrictive settings in the community. CSB also decreased the level of supervision over time until Mother was having extended, unsupervised visits with the children in her home. Although the exact date is not clear from the record, CSB later stopped allowing the children to visit Mother at her home and increased the level of supervision because Mother's participation in case plan services declined.

**{¶6}** During February and March 2020, Mother began missing counseling appointments and drug screens; tested positive for drugs on several occasions; and submitted some urine samples that had been diluted. By June 2020, Mother was no longer engaged in counseling and told the caseworker that she did not believe that she needed mental health services. Mother was eventually terminated by her counseling agency due to noncompliance.

**{¶7}** By August 2020, Mother was terminated from her employment for poor attendance. Although they did not know whether to attribute Mother's declining behavior to drug use or untreated mental health problems, the caseworker and guardian ad litem became increasingly concerned about Mother expressing paranoid thoughts. For example, Mother told them both that she needed to replace her cell phone more than once because someone had been tampering with it or hacking into her account and had deleted and/or created texts, calls, and e-mail messages. Mother admitted to the guardian ad litem that she knew "this sounds crazy[,]" but she maintained that content had been deleted from and/or added to her phones by someone other than her. Moreover, after the furnace was replaced at her former residence and her landlord and the fire department verified that there was no longer a carbon monoxide leak, Mother insisted that there was still a carbon monoxide leak in her home and that she was suffering mental and physical health effects from the ongoing exposure. Mother never sought any medical treatment, however, but continued to attribute most of her problems to carbon monoxide poisoning.

**{¶8}** On November 23, 2020, CSB moved for permanent custody of J.T., C.G., and L.G. Following an evidentiary hearing, the trial court terminated parental rights and placed the three children in the permanent custody of CSB. Mother appeals and raises two assignments of error.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT TERMINATED THE MOTHER'S PARENTAL RIGHTS AS THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶9}   Mother's first assignment of error is that the trial court's permanent custody decision was against the manifest weight of the evidence.  Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1).  R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  (Internal quotations omitted.)  *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶10}  In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment]

must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶11} The trial court found that the first prong of the permanent custody test was satisfied for two alternative reasons: the children had been in the temporary custody of CSB for more than 12 months of a consecutive 22-month period; and Mother failed "continuously and repeatedly to substantially remedy" the conditions that brought her children into agency custody and prevented them from returning home. R.C. 2151.414(B)(1)(a) and (d); R.C. 2151.414(E)(1). Mother does not challenge either of those findings.

{¶12} Instead, Mother challenges only the trial court's finding that permanent custody was in the best interest of her children. When determining the children's best interest, the trial court must consider all relevant factors, including: the interaction and interrelationships of the children, the wishes of the children, their custodial history, and their need for permanence in their lives and whether such a placement can be achieved without a grant of permanent custody.[1] R.C. 2151.414(D)(1)(a)-(d); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶13} During the first several months of this case, Mother's interaction with the children expanded from supervised visits at the family interaction center to unsupervised, extended visits at Mother's home. After Mother stopped going to counseling and began testing positive for

---

[1] Although the trial court is also required to consider whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply, none of those factors are relevant in this case.

drugs, her visits eventually returned to being supervised. During a visit in December 2020, Mother became concerned about the game that J.T. and L.G. played, which involved a hostage-taking situation. She expressed her belief that both children needed mental health assistance, even though they were already engaged in regular counseling. Mother did not follow up with the caseworker or the children's counselors to address her concerns. Instead, she abruptly stopped visiting both children. Mother stopped visiting C.G. in person the following month. By the time of the permanent custody hearing, Mother had engaged in a few virtual visits with C.G., but she had not visited J.T. or L.G. for more than six months.

{¶14} The children were initially placed in separate homes. C.G. had lived in the same foster home throughout this case. By the time of the hearing, all three children were placed in the same foster home, were doing well there, and the foster parents were interested in adopting the three children.

{¶15} The oldest child, L.G., had expressed her desire to return to Mother's custody. She had also stated that she was happy in the foster home where she was living with her siblings. The guardian ad litem did not believe that the other two children were mature enough to express their own wishes, so she spoke on their behalf. She opined that permanent custody was in the best interest of all three children because Mother had failed to remedy her mental health and substance abuse problems and had not otherwise achieved stability in her life. The guardian ad litem explained that Mother continually told her that she was "going to" engage in case plan services. During the year before the hearing, Mother had not engaged in case plan services on a consistent basis and, by the time of the hearing, she was not participating in any case plan services. The guardian ad litem expressed particular concern that Mother seemed to focus more on how this case

had affected her than how her failure to regularly visit her children or work toward reunification had affected her children.

{¶16} By the time of the hearing, the children's custodial history had included approximately 18 months living in temporary placements. The older two children, who have mental health issues, had resided in multiple temporary placements. All three children needed a legally secure permanent placement and CSB had been unable to find any suitable relatives who were willing and able to provide the children with a permanent home. The trial court reasonably concluded that permanent custody would provide them with a legally secure permanent placement.

{¶17} Given the evidence presented at the hearing, Mother has failed to demonstrate that the trial court lost its way in determining that permanent custody was in the best interest of J.T., C.G., and L.G. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PLAIN AND REVERSIBLE ERROR WHEN IT DENIED MOTHER'S MOTION FOR A SIX-MONTH EXTENSION AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT IN THE BEST INTEREST OF THE CHILDREN.

Mother's second assignment of error is that the trial court's decision to deny a second six-month extension of temporary custody was against the manifest weight of the evidence because it was in the best interest of her children to allow her more time to work on the reunification goals of the case plan. This Court's review of Mother's first assignment of error has already determined that the evidence supported the trial court's conclusion that permanent custody was in the best interest of the children. Because permanent custody was in the children's best interest, "a six-month extension of temporary custody necessarily [was] not." *In re L.T.*, 9th Dist. Summit No.

29972, 2022-Ohio-114, ¶ 33, citing *In re A.S.*, 9th Dist. Summit No. 28743, 2017-Ohio-8984, ¶ 31.

{¶18} Moreover, the trial court would have had authority to grant a second six-month extension of temporary custody only if it found, by clear and convincing evidence, that the additional extension was not only in the best interest of the child, but also that "there has been substantial additional progress" on the case plan and toward reunification since the first extension of temporary custody, and that "there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise placed in a permanent setting before the expiration of the additional extension period." R.C. 2151.415(D)(2).

{¶19} Notably, Mother did not challenge the trial court's first prong finding that she had failed "continuously and repeatedly to substantially remedy" the conditions that brought her children into agency custody and prevented them from returning home, so this Court did not detail all the evidence that supported that finding. R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(1). The evidence clearly demonstrated that, at the time of the hearing, Mother continued to struggle with substance abuse and mental health problems and was not engaged in treatment for either of those problems. Mother admitted that she had used amphetamines as recently as four weeks before the hearing.

{¶20} For well over one year, Mother did not comply with the case plan requirement that she complete a mental health assessment, but she testified that she had scheduled an appointment to obtain an assessment soon. Mother admitted at the hearing that her "mental state" was not good at many different points during this case, but she also stated that she did not have any mental health problems. At another point during her testimony, Mother stated that, because of the stress in her life and her exposure to carbon monoxide, she "went off the deep end mentally."

{¶21} In addition to substantial testimony from other witnesses about Mother's erratic and paranoid behavior, the trial judge also heard Mother's testimony and was able to observe her demeanor at the hearing. The trial judge opined that Mother's testimony showed that "[h]er thinking was disjointed" and "demonstrated that [her] need for treatment is great." Mother repeatedly contradicted herself during her testimony. For example, she insisted during the beginning of her testimony that she was then fine after she believed she had suffered carbon monoxide poisoning. Later in her testimony, however, she continued to attribute her scattered thinking to carbon monoxide poisoning and/or the stress of the Covid-19 pandemic. The trial court expressed particular concern that Mother had not been engaging in counseling that might have helped her better cope with her stress and scattered thinking.

{¶22} The evidence at the hearing did not demonstrate that Mother had made "substantial additional progress" on the reunification goals of the case plan since the first extension and there was not reasonable cause to believe that she would be prepared to provide a permanent placement for her children within another six-month period. R.C. 2151.415(D)(2). Consequently, the trial court did not err in failing to grant another extension of temporary custody. Mother's second assignment of error is overruled.

III.

{¶23} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

CALLAHAN, J.
SUTTON, J.
CONCUR.

APPEARANCES:

DANIEL R. BACHE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

BRENDON KOHRS, Attorney at Law, for Appellee.

MICHELE TOMER, Guardian ad Litem.