[Cite as *In re A.B.*, 2023-Ohio-3826.]

STATE OF OHIO      )            IN THE COURT OF APPEALS
                         )ss:        NINTH JUDICIAL DISTRICT
COUNTY OF WAYNE     )

IN RE: A.B.                             C.A. Nos.     23AP0019
      B.C.                                         23AP0020
      M.C.                                        23AP0021

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE Nos.     2021 JUVC 000793
                    2021 JUVC 000794
                    2021 JUVC 000795

DECISION AND JOURNAL ENTRY

Dated: October 23, 2023

CARR, Judge.

{¶1} Appellant Mother appeals the judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her three children and placed them in the permanent custody of Wayne County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

{¶2} Mother is the biological mother of A.B., born February 18, 2016; B.C., born June 16, 2018; and M.C., born July 1, 2019. Father M is the biological father of A.B. Father C is the biological father of B.C. and M.C. Mother has never been married to either father.

{¶3} In 2021, Mother was involved in a romantic relationship with M.H. who is a convicted sex offender whose multiple victims ranged in ages from five to twelve years old.

M.H.'s history of sex crimes against children dates back to 1995, and he is considered a high-risk offender.  In March 2021, A.B. disclosed that M.H. had repeatedly sexually abused her.  CSB got involved with the family, although it is unclear from the record whether the agency had filed a formal complaint or whether Mother had agreed to participate in voluntary services.  In any event, Mother had agreed not to maintain a relationship with M.H. or expose the children to him.

{¶4}    In September 2021, the caseworker assigned to Mother's case saw Mother and the three children together with M.H. at the county fair.  M.H. was observed to be affectionate with the children, using terms of endearment to address them.  Based on the caseworker's observations as well as additional information that Mother was living with the children in M.H.'s home, CSB filed complaints alleging the children to be neglected and dependent.  The agency later amended the complaint regarding A.B. to allege that she was also an abused child.  As there were no appropriate relatives available for a safety plan, CSB sought an emergency order of temporary custody and attempted to remove the children from Mother's home.  Mother initially fled with the children out of state but the agency was able to retrieve them shortly thereafter.

{¶5}    All the parents waived their rights to hearings and stipulated that the children were dependent and neglected.  CSB dismissed its allegation of abuse regarding A.B.  Mother and both fathers further stipulated to the children's placement in CSB's temporary custody and adoption of the agency's case plan as a court order.  Mother's reunification objectives included mental health and psychological/parenting/cognitive assessments, parenting education, and the requirement to follow through on all assessment recommendations.  The agency later added case plan objectives for each father, focusing on basic needs, parenting education, and substance abuse.  All three parents had the opportunity for weekly supervised visits with the children.

{¶6} During the next six months, Mother began to engage earnestly in her case plan objectives. She obtained both assessments. Her psychological assessor recommended that Mother participate in individual counseling and additional parenting education, and that she refrain from engaging in any romantic relationships while she focused on her reunification efforts. Based on her progress, CSB moved for a first six-month extension of temporary custody. All parties agreed to the extension, although the juvenile court noted that Mother had to reengage in mental health services and make progress in that area.

{¶7} Thirteen months into the case, Mother was progressing so well in every area that the juvenile court ordered incremental increases in her visitation. Mother was to first have two hours twice a week of unsupervised visits, followed by additional five-hour weekend visits, then 48-hour overnight unsupervised weekend visits, and finally an extended unsupervised visit from January 1, 2023, until the next scheduled hearing 20 days later. Unfortunately, before any expansion of visitation could occur, CSB learned that Mother had maintained her relationship with M.H. Accordingly, the juvenile court limited her to supervised visitation, once a week in her home and once a week at the agency visitation center.

{¶8} Mother's supervised in-home visits included the services of a one-on-one parenting instructor. Within two months, the agency moved to return all of Mother's visits to the visitation center because Mother was resistant to the parenting instructor's guidance and was engaging in video chats with third persons instead of focusing on the children.

{¶9} CSB filed a motion for permanent custody. The agency alleged that the children had been in its temporary custody in excess of 12 of the prior 22 months and that an award of permanent custody was necessary to meet the best interest of the children. Specifically, CSB alleged that Mother was not demonstrating the ability to apply the parenting techniques taught,

that she had continued her involvement with M.H., and that she was currently in a relationship with another man who was the perpetrator of indicated sexual abuse of a child in another county. In addition, the agency alleged that both fathers had abandoned their children and were not participating in case plan services.

{¶10} The matter proceeded to a hearing on the agency's motion. Thereafter, the juvenile court issued a judgment granting CSB's motion for permanent custody and terminating all the parents' parental rights. Mother timely appealed and raises three assignments of error for review. This Court consolidates the assignments of error as they implicate overlapping issues.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO [CSB], FINDING PERMANENT CUSTODY IN THE BEST INTEREST OF THE MINOR CHILDREN, PURSUANT TO R.C. 2151.414.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO [CSB], FINDING THE CHILDREN COULD NOT BE RETURNED TO [MOTHER] WITHIN A REASONABLE PERIOD OF TIME.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN NOT GRANTING A SECOND SIX-MONTH EXTENSION AS AND FOR THE BEST INTEREST OF THE MINOR CHILDREN.

{¶11} Mother argues that the juvenile court's judgment awarding permanent custody of the children to CSB is against the manifest weight of the evidence. This Court disagrees.

{¶12} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder

of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶13} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶14} CSB's sole first prong allegation was that the children had been in the agency's temporary custody in excess of 12 of the prior 22 months pursuant to R.C. 2151.414(B)(1)(d). The

juvenile court so found, Mother does not dispute this finding, and the record supports it. To the extent that Mother argues in her second assignment of error that the juvenile court erred by finding that the children could not be returned to her within a reasonable time pursuant to R.C. 2151.414(E)(1), her argument is misplaced.

{¶15} The subsection (E) factors are relevant to a determination as to the first prong consideration in subsection (B)(1)(a). CSB did not allege that first prong ground in its motion for permanent custody. Nor did the juvenile court make such a finding. The juvenile court found that the agency had met its first prong burden by presenting clear and convincing evidence of the sole alleged first prong ground which is sufficient to meet that portion of the permanent custody test. *See In re J.B.*, 9th Dist. Summit Nos. 28752 and 28753, 2018-Ohio-244, ¶ 9 ("The five first-prong factors enumerated in R.C. 2151.414(B)(1)(a)-(e) are alternative findings; accordingly, CSB must only prove one of those grounds in order to satisfy the first-prong requirement of the permanent custody test."). As the evidence supported the finding that the children had been in the agency's temporary custody for the requisite time pursuant to R.C. 2151.414(B)(1)(d), this Court concludes that Mother's argument in the second assignment of error alleging trial court error is not well taken.

{¶16} In challenging the juvenile court's finding that an award of permanent custody is in the children's best interest, Mother argues both that the trial court erred in its application of the statutory best interest factors and in failing to grant a second six-month extension of temporary custody to allow her to continue working on her case plan objectives. This Court addresses each argument in turn, beginning with an application of the best interest factors in R.C. 2151.414(D).

{¶17} The children were in Mother's legal custody until they were removed from her home when they were five, three, and two years old, respectively. At the time of the permanent custody hearing, the children were then seven, four, and three years old. B.C. and M.C. were

placed together in the same foster home from the beginning of the case, while A.B. joined them in that foster home a few months later. Neither father ever had legal or physical custody of the children.

{¶18} The children have no relationship with their respective fathers. They are closely bonded with Mother, however. Mother has consistently visited the children, missing only two of 85 in-person visits, once to attend B.C.'s minor surgery and once to await a phone call from her attorney. In addition, Mother participated in all 25 virtual visits offered. Mother was always prepared for visits, bringing food and age-appropriate crafts to engage the children. Her behavior was generally appropriate, although she continued to offer the children "binkies" beyond the ages when that was reasonable. The visitation aide, caseworker, and guardian ad litem testified that the children were always happy to see Mother. No one voiced any concerns regarding Mother's interactions with the children. A.B., B.C., and M.C. are comfortable in their foster home, although the foster parents do not plan to pursue adoption. The children share a strong sibling bond.

{¶19} The children were too immature to express their desires as to custody, although A.B. adamantly told the caseworker that she did not want to go home if M.H. would be there. The guardian ad litem opined that an award of permanent custody was in the children's best interest and that her recommendation did not contradict anything the children had indicated to her.

{¶20} Having been in custodial limbo for a year and a half, the children deserved the opportunity for permanency. Due to both fathers' unresolved issues regarding substance abuse and the inability to meet the children's basic needs, coupled with their failures to maintain relationships with the children, Father M and Father C were not viable candidates for custody. Mother, too, was not in a position to provide a safe home environment for the children.

**{¶21}** CSB developed case plan objectives designed to facilitate the children's reunification with Mother. As required, Mother obtained mental health and psychological assessments and engaged in parenting education. Except for a couple months after she was terminated by her counselor for failure to participate, Mother engaged consistently in services offered. Particularly in regard to parenting education, Mother completed multiple programs. Specifically, she completed Stewards of Children; Darkness to Light; Positive, Aware, Involved, and Safe; and Triple P Positive Parenting Program. Many of those programs focused on identifying individuals who pose a threat to children and learning how to speak with children about abusive situations. In addition, a one-on-one parenting instructor worked with Mother for an entire year. On paper, Mother was a model participant who earnestly took advantage of the many opportunities offered by the agency that were geared toward her level of cognition to help her identify dangerous persons and preventing contact between the children and such people.

**{¶22}** Despite Mother's physical attendance at these services, she remained unable to demonstrate sufficient understanding to incorporate the lessons into her actions. For example, although the agency removed the children from Mother's care because she allowed them to have contact with M.H., a known child sexual offender, and despite Mother's participation in multiple programs designed to help her understand the need to protect her children from such dangerous individuals, Mother continued to maintain a relationship with M.H. throughout the proceedings. Moreover, the guardian ad litem reported that Mother made various posts on social media accounts indicating that she was in romantic relationships with two other men, one of whom had been convicted of sexual conduct with a minor and the other who was the subject of current sexual abuse allegations.

**{¶23}** The psychologist who performed Mother's psychological assessment testified that, in addition to individual therapy and parenting education aimed at ascertaining Mother's assimilation of information, he recommended that Mother abstain from engaging in any romantic relationships while working on her case plan objectives. He believed it was critical for Mother to focus on her therapy and work on implementing the lessons taught during her parenting education without interference from boyfriends who could exploit Mother's vulnerability to mistreatment and influence. Mother failed to comply with that recommendation by pursuing relationships with three different men with histories of sexual offending.

**{¶24}** The caseworker and guardian ad litem expressed deep concerns that Mother not only maintained relationships with inappropriate persons but that she consistently lied about it. Although Mother claimed to have ended her relationship with M.H. once CSB filed its complaints, by sheer happenstance the agency discovered that this was not true. Nine months into the case, the police initiated a traffic stop of M.H.'s vehicle for a broken windshield. The officer's body camera footage captured Mother riding in the passenger seat of M.H.'s car at that time. Although Mother gave a false name and date of birth to the officer during the stop and failed to report the incident to CSB, Mother later admitted she was in the car after the caseworker confronted her with the evidence. Five months later, the police were called to M.H.'s home for a noise complaint. Again, the reporting officer had activated his body camera and recorded Mother as she answered the door. As she did during the traffic stop, Mother gave the officer a false name and birthdate. She told the officer that the home belonged to M.H., that he was a convicted sex offender, that she was M.H.'s fiancée, and that she was staying in the home during the week. She again failed to disclose this incident to the agency.

{¶25} When confronted with evidence of her ongoing contact with M.H., Mother offered implausible excuses to the caseworker. For the first incident, Mother explained that she had needed a ride to buy groceries and no one except M.H. was available and willing to drive her. For the second instance, Mother explained that her three dogs live with M.H. and she was merely in his home to take care of them while M.H. was at work. In both cases, Mother emphasized that there should be no concerns because none of the children were with her during those times.

{¶26} The caseworker testified to the agency's significant concerns that Mother still did not recognize the serious threat her association with sex offenders posed to the safety of the children. For much of the case, Mother denied that M.H. had abused A.B., even claiming that someone must have forced the child to make allegations of sexual abuse. For the first time during the permanent custody hearing Mother finally stated that she believed that M.H. had molested A.B. although she did not want to believe it. She further testified that she understood that M.H. posed a danger to her children. She then asserted that if she had more time, she would refocus, abandon her dogs, and forget about M.H.

{¶27} The guardian ad litem iterated multiple reasons for recommending permanent custody despite Mother's outward compliance with case plan objectives, regular visitation, and the parent-child bond with the children. She cited Mother's prioritizing her relationship with M.H. over her children by maintaining that relationship and even claiming that they were engaged. The guardian ad litem noted Mother's long history of associating with sex offenders, including three different men during the course of the case. She opined that Mother had little understanding, despite engaging in many services designed to accommodate her cognitive deficits, regarding how her involvement with M.H. led to the children's removal. The guardian ad litem emphasized that Mother lacks a positive social network or any type of support structure. Mother is estranged from

much of her family, while those with whom she maintains contact are persons who subjected her to abuse and neglect when she was a child. In conclusion, the guardian ad litem reported that Mother may have technically complied with her case plan objectives but she made no significant changes in her behaviors which put the children at risk of exposure to child sexual offenders.

{¶28} The caseworker testified that she reached out to more than six relatives to find someone who was willing and appropriate to take placement of the child. In each case, none of the relatives responded to the agency's inquiries. The caseworker testified that she has and will continue to explore family placement options as they arise.

{¶29} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by terminating the parents' parental rights and awarding permanent custody of A.B., B.C., and M.C. to CSB. The fathers abandoned the children and failed to participate in reunification services. Despite participating in case plan services, Mother failed to develop adequate insight into the risks posed by sex offenders with whom she repeatedly maintained relationships. She lied about having ended her relationship with M.H., the man who is alleged to have sexually abused A.B. and whose presence in the family's lives necessitated the children's removal from Mother's home. It was by two sheer random coincidences that Mother was caught on police body camera videos in association with M.H., proving that she had not in fact severed ties with him. When the caseworker doubted Mother's explanations for being in M.H.'s car and home, Mother shifted her position by claiming that there was no problem with her association with M.H. because she did not have the children with her at the time. The evidence clearly and convincingly supported the finding that Mother had not developed the necessary understanding of the potential harm her choices would have on her children who are too young to protect themselves from victimization by child sex

offenders. Under the circumstances, CSB met its burden of proving that an award of permanent custody is in the best interest of the children. Accordingly, the juvenile court's judgment terminating Mother's and both fathers' parental rights and placing A.B., B.C., and M.C. in the permanent custody of the agency is not against the manifest weight of the evidence.

{¶30} This Court further rejects Mother's argument that the juvenile court erred by failing to grant a second six-month extension of temporary custody to give her more time to participate in reunification services. We have consistently held that when an award of permanent custody is in the best interest of the children, then an extension of temporary custody necessarily is not. *See, e.g., In re L.T.*, 9th Dist. Summit No. 29972, 2022-Ohio-114, ¶ 33.

{¶31} Moreover, to justify a second six-month extension of temporary custody, there must be clear and convincing evidence that the additional extension is in the best interest of the children, that the parent has made substantial additional progress toward reunification since the first extension, and that there is reasonable cause to believe that reunification will occur within the extension period. R.C. 2151.415(D)(2). In addition to a lack of evidence indicating that an additional extension was in the best interest of these children, Mother had not made substantial progress on her case plan objectives, and there was no reasonable cause to believe that the children could be reunified with her within the six-month extension period. *See* R.C. 2151.415(D)(2).

{¶32} For the reasons enunciated above, this Court finds Mother's arguments unpersuasive. Accordingly, her three assignments of error are overruled.

III.

{¶33} Mother's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SUTTON, P. J.
FLAGG LANZINGER, J.
CONCUR.

APPEARANCES:

JACQUELYN M. DOSSI, Attorney at Law, for Appellant.

ANGELA POTH-WYPASEK, Prosecuting Attorney, and ALEXANDER J. MONTVILAS, Assistant Prosecuting Attorney, for Appellee.